CARMEN NÚÑEZ MÉNDEZ WIDOW OF ANDINO, ETC., Plaintiffs and Appellants, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellee.

No. R-62-270. Decided February 16, 1966.

170

*Ángel Manuel Ciordia* for appellants. *José Antonio Arabía* for appellee.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Santana Becerra, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

A worker was electrocuted and died in the course of his work. The State Insurance Fund paid the sum of $3,693.34 for compensation and expenses connected with the death, and pursuant to the provisions of § 31 of the Workmen's Accident Compensation Act it subrogated itself and filed an action, on behalf of the worker's widow, the three minor children and his mother, against the Puerto Rico Water Resources Authority. It alleged that the accident which caused the death was due solely and exclusively to the fault, negligence and carelessness of the Authority in failing to duly protect the high-tension electric wires which were installed at a place at a height which gave rise to the accident.

Defendant denied the facts and alleged that the accident was due solely, "or almost solely," to the negligence of the operator of the vehicle which came in contact with the high-tension wires in operating the same recklessly, negligently and wantonly, causing it to come in contact with the wires, or to said negligence and the contributory negligence of the deceased worker. After a hearing on the merits at which extensive evidence was heard, most of which was of expertise character, the San Juan Part of the Superior Court rendered judgment dismissing the complaint.

The trial court made the following findings of fact:

"That on February 20, 1957, Rafael Andino Cruz was 21 years of age and was married to Carmen Núñez Méndez, having begotten by that marriage three children named Edwin Rafael, Luis Enrique and Maribel Andino Núñez, the first of whom was one and a half years old, the second six months and the youngest who was not yet born, being a posthumous child.

"That on that date the decedent was working as assistant to his uncle, Pedro Cruz Pinto, on a tower truck to hoist concrete owned by Maximino Ferrán Marrero.

"That the 'tower' installed on the truck was about 35 feet high and could be lowered to its normal position to a height of approximately 10 feet.

"That on that same date a second story was being added to a building which was under construction on a lot adjacent to a corner building forming a 'T' on Comerío and Olivero Streets of Bayamón. That at that time this corner building had a plant which fronted Olivero Street on the north, Comerío Street on the east, the building under construction on the south, and on the west, a vacant lot fronting Olivero Street and extending to the rear of the building under construction.

"That even though the lot on which the corner building is erected is classified as commercial I, the adjacent lot, namely, the vacant lot, is classified as residential, and the other lots have one-story zinc-roofed frame houses.

"That Rafael Andino Cruz, as assistant worker of heavy equipment, earned between $40 and $50 a week and used his income to support his home and also helped his mother to whom he gave $3 or $4 a week.

"That on February 19, 1957, about 5 p.m., Pedro Cruz Pinto, chauffeur of the heavy equipment owned by Maximino Ferrán Marrero, took the 'tower' truck with his assistant, Rafael Andino Cruz, to the yard of Carmelo Martínez' property situated on Comerío Street of Bayamón. The said lot is situated on the south of Olivero Street. That same afternoon they set up and prepared the 'tower' which was 35 feet high in all in order to use it next day for pouring the concrete slab of the two-story building being constructed on the lot on Comerío Street.

"That although the master builder testified that between 3:30 and 4 p.m. he called the Water Resources Authority from Farmacia Popular so that they would take precautions (although he did not know the height of the tower), the fact is that the call was not received in the offices of defendant, nor did it have knowledge of the manner in which the work was to be performed.

"That on February 20, 1957, after completing the work of hoisting concrete to the second story of the building under con-

struction, Pedro Cruz Pinto was operating the tower truck in order to take it away from the lot.

"That the truck stood in an oblique position inside the lot with its rear toward the building under construction and its front toward the right-hand corner of the front of the lot, viewed from the street. The tower extended at an angle of 90 degrees, that is, in a vertical position and at a distance of 25 feet from defendant's wires, but it was lowered to an angle of 45 degrees so that its upper end was about 30 feet from the ground and at the same height as defendant's cables. While in this position the chauffeur started the truck, lost control and the front wheels rolled forward owing to the declivity of the land, and its end touched a 4,600-volt wire in the very moment that Rafael Andino Cruz was hurriedly placing a wedge on the rear right-hand wheels in order to prevent the truck from rolling forward.

"That as he tried to place the wedge he touched the metal part of the truck, receiving an electrical shock through the tower and died by electrocution shortly afterwards.

"That defendant's electric wire lines along Olivero Street with which the tower of the truck came in contact consisted of three wires carrying a 4,600-volt current starting at a pole on the sidewalk of Comerío Street, on the opposite side of the end of Olivero Street and approximately in line with the axis on the center of Olivero Street. This pole on Comerío Street was 45 feet high and supported, in addition to the wires on Olivero Street, wires of other lines extending along the whole length of Comerío Street. The wires of Olivero Street lines were affixed to this pole at a height of 38 feet, and from this pole they extended to another pole standing outside the sidewalk which was 35 feet high and holding the wires at a crossbar at a height of 28 feet 8 inches above the sidewalk. One of the three wires of the line was affixed to the inside of the crossbar, that is, next to the sidewalk, and two on the outside of the crossbar. From this pole the wires extended to a 45-foot pole standing on the corner of the sidewalk formed by the intersection of Olivero and Ferrer Streets. This 45-foot pole, like the first pole of the line which, as we have said, was standing on Comerío Street, and like the other poles, were intersecting line poles, that is, that they supported different crossing lines. The wires of the Olivero Street line on all of these intersecting poles ran at a height of

about 35 feet, since in addition to the Olivero Street line, they supported other lower voltage lines extending along the other streets and which should have been installed at a lower altitude, but never less than 20 feet.

"At the place where the tower came in contact with the Olivero Street line the wires were at a horizontal distance of 47 inches from the vacant lot and more than 28 feet from the ground.

"Since the Olivero Street line started at a point on Comerío Street in line with the axis of Olivero Street and from there it extended toward the inside of the southern sidewalk, its position was somewhat oblique in relation to the wall of the corner building, fronting Olivero Street. Hence, the shortest distance between that line and the building was in front of the corner of the building formed by the vacant lot and Olivero Street. Thus, from the lines to the corner of an eave projecting from the wall of the second story constructed on the building after the accident there is a distance of 67 inches, about 2 feet more from the nearest wire of the line to the wall of the corner of the building.

"The contact of the metal tower with defendant's lines occurred in front of a vacant lot where the lines were more than 28 feet high above ground, so that they came within the safety standards of the 'National Electrical Safety Code.' This code recommends a minimum vertical height of 20 feet above ground for wires conducting between 750 and 15,000 volts whenever they cross on 'public streets, alleys or roads in urban or rural districts,' and when those wires run along public highways in urban areas. The 20-feet minimum height has been fixed considering that vehicles as high as 14 feet travel in normal traffic.

"According to the 'National Electrical Safety Code,' electric lines of less than 8,700 volts should have a minimum horizontal separation of 3 feet from the building if the latter is higher than the lines. If a horizontal separation of 3 feet or more is not possible, they should then be installed at a height of not less than 8 feet above the building.

"That Carmen Núñez Méndez Widow of Andino, her three minor children, Rafael, Luis Enrique and Maribel Andino Núñez, and Andino Cruz's mother, Emérita Cruz Pinto, suffered material damages as well as mental and spiritual anguish as a result of the death of worker Rafael Andino Cruz.

"That the State Insurance Fund paid the sum of $3,693.34 as compensation and expenses of the deceased worker, subrogating itself in that amount in this action, pursuant to the provisions of § 31 of Act No. 45 of 1935, as subsequently amended."[1]

■ We have made a detailed examination of the extensive and to a certain extent complex evidence. We agree with the trial court that there was negligence and lack of precaution on the part of the operator of the tower truck at the time of the contact. The evidence shows that the height and the position at which the tower should be placed before moving or operating the truck inside the lot in order to take it out on the street were not duly calculated. However, despite the operator's negligence, in the light of the evidence in the record, that was not the only, entire and sole negligence involved in the accident. The record shows that defendant was also partly at fault. The 4,000-volt line along Olivero Street extended at a height of 38 1/2 feet from a pole on Comerío Street and ran along the whole length of Olivero Street at a height of 33 feet and was separated by 6 feet and 7 inches from the construction line. At the place of the accident defendant maintained the line running from a crossbar which was only 28 1/2 feet high, 27 feet 5 inches at the place of the contact, and at a separation of only 47 inches from the construction line at that place.

There is evidence in the record that in 1945 defendant changed the poles on Olivero Street, as a result of which

---

[1] From the extensive evidence heard, both oral and documentary, photographs, blueprints and drawings, there appear other pertinent facts to which we shall refer.

The parties are agreed on the following corrections: (1) The Comerío Street pole was 45 feet long, not high, of which 6 feet were grounded, the wires being at a height of 38 feet. (2) The first pole on Olivero Street (proximate to the accident) was 35 feet long, not high, 6 of which were grounded, the wires being at a height of 28½ feet (the altitude of the crossbar). (3) The other poles on Olivero Street were 40 feet long, not high, and supported the wires at an altitude of 33 feet.

According to defendant's blueprints and dimensions, the height of the wire at the exact place of contact (not at the crossbar) was 27 feet 5 inches.

this line was raised higher and at a greater distance from the buildings. The evidence shows that the pole at the place of the accident was not changed. It was explained that it was not an intersection pole. Whatever the reason, those facts show that the safety standard considered by defendant in this section was, in the light of all the circumstances, the maximum height of 33 feet for an uninsulated wire and the maximum separation of 6 feet from the houses. The record does not disclose any technical or functional reasons compelling defendant to maintain the line lower and closer to the constructions at that particular place. From the description of how the accident occurred as it appears from the evidence, and as found proved by the court, it is an undisputable fact that if the line at that place had been at the same height and separation as on the rest of the street, the contact would not have occurred despite the lack of precaution in operating the tower truck.

In its conclusions of law the trial court held that the greater or lower height was immaterial. That when electric power companies install their lines on poles on public highways, they can only foresee and anticipate the presence of persons on the streets using the public thoroughfare in the usual and common manner as do the pedestrians and vehicle operators, that is, to transact and travel along them; that defendant could not expect or anticipate that its lines would be reached by the tower of a truck in the area where the accident occurred where normally and commonly no activity was carried out, and much less the activity connected with the construction of a building; that defendant could not foresee that a truck with a tower 30 feet high would be used to supply concrete in the construction of a house at the place where the truck was standing, nor foresee that it could be operated in the manner it was operated; that even if defendant had been negligent in maintaining its line at that place in the aforesaid manner, such negligence

was not the proximate cause of the accident, but an intervening or independent agent.

In the light of the record, we cannot agree with the trial court's conclusion that at the place and under the circumstances therein present defendant could not foresee or anticipate the occurrence and thus maintain its uninsulated lines in such manner as to avoid accidents. Part of that section is commercial and part residential. The building under construction was located precisely in a commercial sector, Comerío Street. The truck was installed on a vacant lot adjacent to the building under construction owned by the same owner, which extends as far as Olivero Street, parallel to Comerío. That section, taken as a whole, was not a separate area nor a place where the development or construction activity which is going on everywhere in the metropolitan zone, within the present phenomenon of development and general expansion in Puerto Rico, was not probable or foreseeable. One of those places where there has been more expansion and development in the construction activity is the city of Bayamón. Perhaps because of that fact since 1945 defendant installed on that street larger poles than at the place near the accident, and installed the line at a height which in its opinion was reasonably safe. It is significant that one month after the accident defendant no longer used the lowest 35-foot pole and replaced it with a 40-foot pole the same size as the others, as a result of which the 4,000-volt line was raised to the same height and separation as those on the rest of the street. Not only the use of the street by pedestrians or by vehicles but also by mobile construction machinery, according to present day uses, was foreseeable.

In its legal aspect, this case is governed by the doctrinal norms stated with utmost clarity by Mr. Justice Pérez Pimentel in *Ginés* v. *Aqueduct and Sewer Authority*, 86 P.R.R. 490 (1962). In a situation of law similar to that

now under consideration, it is stated in *Ginés* that there is no rule of thumb to determine when the causes of an accident are proximate and when they are remote, and each case must be decided by taking into consideration its particular facts and circumstances; an intervening cause is one which comes into active operation in producing the result after the actor's negligent act or omission has occurred. A defendant ordinarily will not be relieved of liability by an intervening cause which could reasonably have been foreseen, nor by one which is a normal incident of the risk created. A defendant will be relieved of liability by an unforeseeable and abnormal intervening cause which produces a result which could not have been foreseen. The mere fact that there is an intervening act by a third person does not convert the actor's action in a remote cause, if he could or should have foreseen that intervention. A new unforeseeable force breaks the chain of causality. Thus, when the voluntary act of a liable person is interposed between defendant's negligent conduct and the damage suffered by plaintiff, the problem of foreseeability is the same and it may serve as a measure for determining whether defendant's conduct is one of the proximate causes of the accident. It is also said in *Ginés*, which is of particular application in this case in view of the trial court's opinion, that the rule of foreseeability does not mean that the *precise* risk or the *exact* result which was encountered should have been foreseen. The essential factor is to be under the duty to foresee, *in a general way*, consequences of a particular type. It is no defense to allege that the *precise course* or the full extent of the consequences could not be foreseen, the consequences being of the kind which were actually the ones present. Also, that a defendant is liable if his negligence is a proximate cause of the damage although it might not be *the sole* proximate cause of such damage. Liability does not depend alone upon whether, in the exercise of reasonable

diligence, the defendant could foresee or ought to have foreseen the very injury complained of, but the party charged with negligence may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission. It is therefore unnecessary that the defendant should have anticipated the *very* injury complained of, or anticipated that it would have happened in the *exact manner* that it did.

The principles thus stated in *Ginés* govern the rule of law in this case. The holding in *Widow of Dávila* v. *Water Resources Authority*, 90 P.R.R. 316 (1964), is also applicable. ▪ In this case the worker's employer, as principal, was at fault for the negligence of its other employee, the truck driver. The death was a labor accident. Under the system of the Workmen's Accident Compensation Act (Sess. Laws, p. 250), his insured employer is not liable to the worker for the accident, even if there be negligence. Section 20 of Act No. 45 of April 18, 1935 (Sess. Laws, p. 250). See *Cortijo Walker* v. *Water Resources Authority*, 91 P.R.R. 557 (1964). The employer in this case could not be a direct codefendant, nor would he be indirectly liable as a third-party defendant, nor could defendant afterwards recover from the employer as collaborator of the damage.[2] The immunity of an *insured* employer from liability for damages due to his fault is absolute under the integral operation system of the law providing compensation for labor accidents.

---

[2] 1 G. Marty, *Derecho Civil—Obligaciones—Delitos y Cuasidelitos* 410. "There is plurality of liable parties in two cases: First case: When the damage has been caused jointly by two or several liable parties. In this case the victim has, as we have said, an action against each one of the liable persons for the total damages until he is fully indemnified. (*Obligation in solidum.*) However, once the victim is indemnified, an action accrues to the person who paid against the other liable parties and the indemnification for the damage should be apportioned among them. This is what the case law has done taking into consideration the seriousness of the faults." *Cf. Rivera* v. *Great Am. Indemnity Co.*, 70 P.R.R. 787 (1950).

In view of the foregoing, and of the fact that this case is governed by the special Act on the matter, defendant should be held liable for the damage only in proportion to its fault and to the degree of contribution in producing the same. Considering such proportion and degree in the light of all the facts and circumstances in the record, defendant shall be liable for a sum not to exceed $23,000 for all the plaintiffs, to be allotted in a proportion of five-twelfths (5/12) for the mother, and two-twelfths (2/12) for each of the three children out of the balance left after plaintiff Fund recovers its disbursements, as provided by law. The costs and the payment of the sum of $1,500 for attorney's fees are imposed on defendant.

Judgment will be rendered accordingly reversing the judgment of the trial court dismissing the complaint.